The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Good morning, Counsel. Good morning. Good morning. All right. Ms. Hashimoto, we will hear from you. Thank you, Your Honor. Erica Hashimoto on behalf of Elbert Smith. With the Court's permission, third-year law student Noah McCullough will be arguing the case for Mr. Smith, and I will remain present while he is doing the argument. But you always have to announce for the record what school it is. Georgetown Law Center, Your Honor. All right. The Bulldogs are here today, huh? That's right. Okay. Ms. McCullough? Yes. May proceed. May it please the Court. Defendants forced Elbert Smith to languish in the harshest segregation conditions at Wallens Ridge State Prison with no end in sight. Before Wallens Ridge, Mr. Smith was on a path out of segregated confinement. He was advancing in the step-down program and had enrolled in and completed the first required curricular series. But once Mr. Smith arrived at Wallens Ridge, everything changed. Defendants moved him back to the harshest level of the step-down program and forced him to endure— Yes, Your Honor. You may not know the answer to this, but when he went to Wallens Ridge and they dropped him back down to the harshest level, what reasons were given for that, if any? Initially, Your Honor, there was no reason. A VDOT policy would require a step level in the step-down program to be recorded in each of the 90-day ICA reviews. And for the first over a year and a half at Wallens Ridge, defendants did not report a step level at all. Instead, it just said status change to segregation administration or administrative segregation. And so there was no step level at all and no justification. It wasn't until later on in the process. And so no justification for a year and a half. Is that what you said? Yes. Okay. And when they finally gave some sort of justification, what was it? Initially, it was longer period—needs longer period of stable adjustment. There was one review in which it said simply should remain in segregated confinement. And that was the initial rationale. After a series of reviews, they started introducing another justification, noncompliance with the grooming policy. But initially, it was simply needs longer period of stable adjustment. Okay. Thank you. The conditions that Mr. Smith endured in Wallens Ridge were harsh. And all three of Wilkinson v. Austin's factors taken together established Mr. Smith had a protected liberty interest in avoiding that type of segregated confinement. Wilkinson's first factor looks at the magnitude of confinement restrictions. And here, that factor weighs in Mr. Smith's favor because he endured all of the same extreme restrictions that the Supreme Court was concerned with in Wilkinson v. Austin. Like the inmates in Wilkinson, Mr. Smith was kept in his cell for 23 to 24 hours a day with the lights on at all times. Like the inmates in Wilkinson, he was forced to eat all of his meals alone in that cell. And his cell was modified with metal strips that prevented any communication. And like the inmates in Wilkinson, his opportunities for visitation were rare and always conducted behind glass walls. Thus, like the inmates in Wilkinson, Mr. Smith's confinement at Wallens Ridge was synonymous with extreme isolation. And the first factor weighs in his favor. Wilkinson's second factor also weighs in Mr. Smith's favor because he endured these conditions for a lengthy duration. And throughout that time, he had no indication that he would ever be able to leave. Smith's four and a half years at Wallens Ridge is much greater in duration than the abbreviated periods that are insufficient to support a protected liberty interest like Sandin and Bevarati. And is way beyond what other courts have found is sufficient to support a protected liberty interest. And throughout that time, Mr. Smith had no indication he would ever be able to leave. By initially not offering any rationale at all as to why he was placed in the harshest segregation conditions at Wallens Ridge, and then eventually getting only vague justifications like he needs a longer period of stable adjustment, Mr. Smith had no guidance as to how he would ever be able to get out of segregated confinement. Wilkinson's third... I guess they gave him some guidance. They told him to cut his hair, right? Your Honor, they did include the noncompliance of the grooming policy as one justification. But they often included that justification in conjunction with needs longer period of stable adjustment. And needs longer period of stable adjustment provides no indication as to what he could ever do to address that justification. Yes, Your Honor. And can you talk about why the noncompliance with the grooming policy impacted your client's ability or inability to get out of segregation? Well, Your Honor, they constantly cited this noncompliance of the grooming policy as the justification. It impacted Mr. Smith in multiple ways. First, a reasonable juror looking at this record could find that that simply was not the real reason that he was being kept in the harshest... Yes, Your Honor. Sorry, my hands are backward here. Actually, first, what was the reason his hair was longer? Wasn't that because of his religious expression? Yes. Smith is a practicing Rastafarian. And in many of these ICA reviews, the record shows that he was pleading for a path back to the grooming policy violators' housing unit. But defendants refused and mindlessly recited the three rationales we've discussed, either that he should, quote, remain, end quote, in segregated confinement, that he needed a longer period of stable adjustment, or that he was in noncompliance with the grooming policy. So the first two rationales are so vague that they provided no guidance to Mr. Smith as to how he could ever get out. And the third rationale Smith not only could not address because he was a practicing Rastafarian whose religious beliefs precluded him from cutting his hair. Yes, Your Honor. Suppose that for the sake of argument that we agree with you on the protected liberty interest. Do you think you need further discovery to demonstrate that there remains a genuine dispute of material fact as to the adequacy of the process afforded Mr. Smith? Yes, Your Honor. We believe we need further discovery on the issue of process given to Mr. Smith and whether he ever actually received meaningful review. One example of the discovery that's needed is the discovery Mr. Smith sought on the additional layers of review that defendants have relied upon in their briefing. Mr. Smith sought the records that were generated in these reviews, as well as the names and positions of everyone that was involved. And in seeking this discovery, he described how important it was to his claim, yet defendants never produced it. And so this court should find that Mr. Smith had a protected liberty interest should remand for further discovery and to allow the district court to address the level of process due in the first instance. But based on the limited record before the district court, a reasonable juror could conclude the defendants failed to provide the meaningful review that Mr. Smith was constitutionally entitled to. The vague and arbitrary rationales that Mr. Smith received, if he received a rationale at all, were insufficient to constitute meaningful review, which requires an explanation to the inmate as to why they remain in segregated confinement, as well as guidance as to how they can adjust their behavior in order to get out. Mr. Smith did not receive that at each of these 90-day reviews in which defendants mindlessly recite the same rationales repeatedly. Like in Nkuma, defendants were repeating rationales perfunctorily and wrote repetition. Mr. McCullough? Yes, Your Honor. May I ask you a hypothetical? I'm not trying to give you – it's almost a counterfactual in a sense, but be careful with it, but it's hypothetical.  What if they told him that a longer period of stable adjustment meant, because of your offense for which you were convicted, assaulting a correctional officer, that that was so egregious that the longer period was a matter of time? And that is, in our view, it's going to take at least four years for you to come to a sense that we can trust you in general population and a step down. So, basically, even though you get a 90-day review, we're telling you it's just so egregious that it's going to be at least four or five years before we even think about getting you out of the city. Would that be a violation? A non-meaningful review? That's the hypothetical. I know it's not the facts here. Your Honor, that hypothetical would still be problematic. These reasons – an inmate is entitled to reasons to explain how they can address their future behavior. As the Supreme Court explained in Wilkinson v. Austin, a short statement of reasons is critical in order to provide the inmate guidance as to how to adjust their future behavior as well as to guard against arbitrary decision-making. And declaring at the outset that no matter what the inmate does or what behavior they engage in or what programs they participate in, that there is no way that they can ever leave segregated confinement is problematic. That hypothetical would make the confinement of that inmate more definite if they were to provide a fixed time period in advance. But Mr. Smith, unfortunately, never had such guidance. He had no indication throughout his time at Walton's Ridge that he would ever be able to leave. And so he endured those extreme restrictions that we've discussed indefinitely throughout his time at Walton's Ridge. So you're saying that the standard would have to be something that he would have some control over other than just temporal passing of time? Your Honor, defendants are required to provide guidance to Mr. Smith as to what he could do in terms of his future behavior to get out of segregated confinement. So they need to review him as he is in segregation and then explain if they're not moving him up to another privilege level. It's important to remember that defendants not only chose to keep him in segregated confinement, but to keep him at the harshest level of segregated confinement, the most extreme restrictions. And so if defendants were to simply say we will not consider ever increasing your privilege levels at all for the next four years because of previous conduct that cannot be addressed by future behavior, that would be problematic. This is not meaningful review. It doesn't take into account how the inmate has progressed or changed throughout that period. But a follow up question, which is not a hypothetical, is the fact here. Would you say that the fact that they said you won't comply with the grooming policy, that alone lets us know that your attitude has not changed? You won't even comply with that in order to get out of segregated confinement. In their view, spoke volumes in terms of your mental attitude about it. I know you're not going to agree with that, but is that an answer to that? That's a part of it that you can't control your attitude. And one is cut your hair. Let us know. At least you're in a spirit of compliance and you really want to get out. What about that? Well, Your Honor, the record here does not does not indicate that they often use the grooming policy rationale in conjunction with other vague rationales. Smith had no indication that even if he abandoned his religious beliefs and endured kind of the cruel dilemma that was put to him, violating his religious beliefs or languishing in segregation forever, he had no indication that if he complied with that policy that he would even advance to the next privilege. But the grooming policy rationale is also problematic because a reasonable juror could find that it simply wasn't the real reason he was languishing in segregated confinement. A reasonable juror could look at the fact that VDOC in practice did not assign inmates to segregation for violating the grooming policy. In the first instance, that Smith was advancing in the step down program before he arrived at Wallingsbridge. And perhaps most importantly, that within weeks of being transferred out of Wallingsbridge, out of defendant's control, he rapidly advanced from the harshest segregation restrictions to the initial stage of non-segregated confinement. So looking at all of those facts from the record, a reasonable juror could conclude this simply wasn't the real reason. And meaningful review requires providing an explanation as to why the inmate is remaining in that segregated confinement level and what they can do to get out. Yes, Your Honor. So I guess on the other end, when he got to Red Onion and within a month or a little over a month, he rapidly advanced. What reasons were given for his rapid advancement there, if any? The review in which he was advanced from the harshest segregation restrictions to the initial stage of non-segregated confinement cited his completion of the challenge series, which is the first required curriculum program in the step down program. This was in December of 2017, but he completed the challenge series before being transferred to Wallingsbridge in the first place. So the justification that was given as to why he deserved non-segregated confinement was the completion of a curriculum series that he completed a week or two before being transferred to Wallingsbridge and forced into this indefinite segregated confinement. Yes, Your Honor. Before you sit down, would you talk about the elephant in the room that is qualified immunity? If we agree with you as to the conditions, how do you propose we get around qualified immunity? Well, it's important to note at the outset that the district court did not address qualified immunity. And so we believe that because qualified immunity is an individualized assessment of each defendant individually, that it would be prudent for this court to remand this case for further proceedings on that issue, for factual conclusions about the different degrees of involvement, as well as further discovery, in particular on those multiple layers of review that we discussed earlier. But should this court address the issue, it should hold that defendants are not entitled to qualified immunity. As Mr. Smith's liberty interest was clearly established at the time of the challenge conduct. His liberty interest was clearly established by Wilkinson v. Austin, and a reasonable prison official would have understood that because Mr. Smith was being confined in virtually the same extreme restrictions as was described in Wilkinson, that he needed a level of process in order to continue being kept in those conditions indefinitely. And Mr. Smith's right to meaningful review was also clearly established at the time of these violations, and a reasonable prison official would have understood that repeatedly reciting, rotely repeating perfunctory rationales, as this court explained in Nkuma, was not meaningful review. A reasonable prison official looking at Nkuma and how the court there said that the review in that case fell short of Hewitt because they rotely repeated perfunctory rationales. A prison official would have understood that not providing a reason at all for keeping Smith in segregated confinement and then rotely repeating either vague or pretextual justifications was not enough to constitute meaningful review. Your Honors, if there are no further questions, I reserve the remainder of my time for rebuttal. Thank you, Mr. McCullough. Good morning, Your Honors, and may I please? Good morning, Your Honors. Yes. Can you hear me? Yes, I hear you, yes. Good morning, Your Honors, and may I please the court? Martine Ciccone for the appellees. I'd like to start my argument where Judge Floyd left off, which is the question of qualified immunity. Mr. McCullough stated today the same single case that they believe clearly established the right to due process procedures, and that's Wilkinson v. Austin. But as we discuss in our brief, every sitting judge in the Western District of Virginia, which is the district where this case was brought and where both the Wallens Ridge and Red Onion prison facilities are located, has looked at the specific features of the step-down program under the three-part test enunciated by the Supreme Court in Williamson v. Austin and found that the conditions of confinement under that test are not harsh and atypical when compared with the ordinary instances of prison life. Yes, Your Honor. I guess that's assuming the test is and the procedures are followed in a meaningful way. Yes, there are procedures and policies in writing that at first blush could appear to provide due process, but the fact that reliance on those procedures only highlights for me the importance of meaningful review and that the procedures are actually followed without some sort of, as opposing counsel says, just sort of rote explanations randomly. And for the first year and a half, no explanation at all. Your Honor, if I could address your question in two ways. First, when we're talking about the question of whether a liberty interest was created by the conditions of confinement, I think the question of the particular procedures and the explanations given is less relevant. Every court that has reviewed this and has applied the three-part test from Wilkinson, which looks specifically to whether a liberty interest was created, has considered the conditions of confinement and the purposes of the step-down program, which is, of course, to allow an inmate to have a pathway back to general population. It is intended to be an iterative process. It is intended to be a process by which the inmate knows what he needs to do and to move forward through that process. Yes. I'm sorry. So what was Mr. Smith's pathway to getting out of segregation here? What was it? Your Honor, I think one of the rationales that was repeatedly emphasized was his failure to comply with the grooming policy, and that was, at the time, a relevant factor that the officials considered. He would have gotten a poor grading on his personal hygiene scores every week. So Mr. Smith would have known that personal hygiene scores were part of the consideration. Okay. Two questions, then, with regard to the grooming policy. The first is, when the grooming policy impacts his religious beliefs, how does that impact our consideration here? And secondly, what about the fact that the grooming policy was not a reason for segregation otherwise, that they had a separate unit for people who failed to comply with the grooming policy, particularly for religious reasons? Let me take the second part of that question first, because I think that's a mischaracterization that sort of comes through these briefings, which is the grooming policy applied to all inmates at VDOC equally at the time that we're talking about here. The way that VDOC dealt with persistent violators of the grooming policy who were not in segregation was that they were held in the grooming violators' unit, which is where Mr. Smith was originally. But the policy applied the same, and violations of the policy were subject to discipline and to consequences for everyone. So in terms of the consideration of the Wilkinson factors, whether or not that should – how that – how that affects your determination of whether a liberty interest is created, really the only question is whether there was a difference in treatment between those in segregation and those in the general population. And with respect to the grooming policy, there was not. For all violators of the grooming policy, they were – sorry, for all inmates, they were required to follow the grooming policy. They were required to do so notwithstanding religious objections. That, of course, has changed over time. But at the time, that was the policy. And I would add that I think there's a reason here that that element of this case does make it a little bit challenging to review the constitutional question because of changes in the law. And I would just point out that there were other – yes. But he didn't ultimately cut his hair, yet he was released from segregation at Red Onion a month after he got there because he had – the reason being, according to opposing counsel, because he had completed the challenge program, a program he had completed well before he even went to Wallins Ridge. So how is that a reason? Your Honor, there is an element there that's – I think there's a missing element there, which is that the policy changed. The policy with respect to how VDOC treated religious objectors who violated the grooming policy in segregation changed a couple of days or right around the time that Mr. Smith returned to Red Onion. And he returned to Red Onion with all offenders who were held in segregation, had nothing to do with this lawsuit. Everybody moved from Wallins Ridge to Red Onion. And then at the same time, the policy changed. So he was permitted to leave because, pursuant to the new policy, those who had religious objections to cutting their hair were no longer penalized on their personal hygiene scores. And again, to get to the qualified immunity point, I think this really highlights why qualified immunity is critical here. There have been other cases in the Western District that also involved the grooming policy, and nonetheless, every sitting judge has recognized no liberty interest there. So – and I would add that two of those cases were affirmed by this court. And from the perspective of the reasonable officer standard, to say that it would be unreasonable for – Which two cases are you talking about that were affirmed? One was DELC, and the other one was – I'm sorry, the name is escaping me. I think it's ABYEI. But both were affirmed in unpublished decisions. And I'm not suggesting – That's what I thought. Okay. That's right. I'm not suggesting that – and I think from the question of what is clearly established law, the fact that these are district court decisions, the fact that they're unpublished, and the fact that the court of appeals decisions were unpublished would certainly be relevant, and in fact, it would be dispositive if I were standing here telling you that those decisions clearly established the right at issue. But I'm not. My opposing counsel, my friend on the other side, has said that Wilkinson v. Austin clearly established that Mr. Smith had a liberty interest. And I think that's plainly incorrect, because every sitting judge that has looked at this, that looked at this during the time at issue, and considered whether under the standard in Wilkinson v. Austin, under that three-part test, looked specifically at the features of the VDOT program. Yes, Your Honor. Sorry. Your opposing counsel also said that the district court here didn't actually consider qualified immunity. Is that the case? And if so, why shouldn't we just remand it back for the district, if we are inclined to agree with him, for the district court to consider that in the first instance? That's correct, Your Honor. And, of course, this court has the authority to affirm on any base supported by the record, and we believe it is supported by the record here. It has done so. We cite in our brief Atkinson v. Holder, which is a case where this court did affirm on qualified immunity, even though the district court did not address it. And I think there are three reasons to do so here. The first is Mr. Smith concedes that his claims for injunctive relief are moot, so the only issue here is the due process claim in their individual capacities, and that claim will be dispositive of that claim at some juncture. And the Supreme Court has said that qualified immunity should be decided at the earliest possible juncture. And I think here, unless you reverse the district court and find that the district court abused its discretion with respect to discovery, and I'm happy to discuss that. I think it's very clear that the district court did not abuse its discretion. But leaving that aside, the record is set, and the legal landscape at the time that this interaction with Mr. Smith was ongoing could not have been more clear. Again, the only case that my friend cites is clearly establishing his liberty interest. And again, the liberty interest question, we're leaving aside for the sake of argument in CUNA and the meaningful review, the liberty interest question, the only case he cites is Wilkins v. Austin. Yes, Your Honor. To continue, again, I think you have a dozen federal judges finding no liberty interest. To say that it would have been unreasonable for a person in the defendant's circumstances to not have recognized that clearly established law would be contrary to any doctrine of qualified immunity that I'm familiar with. But just to sort of put even a finer point on it, I would add that this court two years ago in Williamson v. Sterling, which is a case involving pretrial detainees who have a greater liberty interest than prisoners, made clear, and this is at footnote 26 of the court's opinion, that Wilkinson was not sufficient for qualified immunity. And what that court said was, although Wilkinson is an important precedent in the body of law providing defendants with fair notice of their due process obligations, that decision alone was not sufficient notice to bar the defendant's claim of qualified immunity. Put succinctly, the Wilkinson court applied a cumulative approach that relied on factors not present here, such as the parole implications of assignment to a supermax facility. That is a published decision, and I think that holding specifically applies here. And if that was true with respect to pretrial detainees, it is equally true with respect to the defendants. Yes, Ron. Ms. Sicconi, this is my question very carefully, because this is what my concern is. If I'm not making it clear, let me repeat it and I'll make it clearer. You said that in terms of determining atypical confinement, conditions of confinement, we only look at segregation where he was or general population. But is that true? Because we kind of glossed over it a bit, we talked about it, but there was, as you said, a unit for violators of grooming policy. Now, would you agree that those persons in the violators unit, they weren't subject to 23 hours of lockdown, were they? I don't believe so, Your Honor. I don't know the specifics of the grooming policy. They weren't subject to body and cavity searches every time they left and reentered their cells, were they? They were not, Your Honor, as far as I know. Well, then, think about this. And you would agree, did Mr. Smith ask more than one time, is there any way I can get out of here without cutting my hair? That's what he said. There was a place that in terms of, if you assume, I know you disagree with it, but if the condition of confinement, continuing confinement, was his past conduct, but you never gave him any real meaningful way to get out on that basis, then at the very least there was a place for him to go as a, and then not as a violator because he would be for religious purpose. So that means he was given less consideration for religious purpose than those persons who just for hygiene or slothfulness or whatever, just would, whatever, groom themselves. So it's not just segregation and general population. That's the factual question whether or not, so those cases you talked about, other judges looking at it, that's a factual question here. Don't you agree that that was a place and he asked to go there? Your Honor, I do agree that he asked to go there. I do not agree that that's relevant to the qualified immunity analysis. For one, there were cases that involved grooming violators. Barksdale is one of them. It's cited in our brief. But to your point about whether he was, whether he should have been allowed to go to the grooming violators unit, that was not VDOC policy at the time. And I'll point out that Mr. Smith committed the assault on a corrections officer, which is the reason that he was placed in level S segregation. It was when he was in the grooming violators unit. But again, what the grooming violators unit was, it was not a means to allow a free pass to violate the grooming policy. It was at the time the way that VDOC managed persistent violators of that policy. Again, everybody was subject to the grooming policy. At the time, even religious objectors were subject to the grooming policy. And you may have concerns about that. This court has developed law on that, and VDOC has changed its policy in response to decisions by this court, by the U.S. Supreme Court. And the grooming policy is quite different today than it was at the time. But to your point about whether he could have just been given a path to the VHU, the answer is he was required to go through the step-down process. And until he was at level six, he was not permitted to go to the VHU. Yes, Your Honor. For the step-down process, then, what does needs longer period of stable adjustment mean? Your Honor, I would take that. Go ahead. I would take that to mean that he needed to comply with the requirements of the step-down process and to follow the rules, which he was not doing at least with respect to the grooming policy. Was he told that's what that meant? Your Honor, the record shows that repetition. I recognize that. But I think it's important that we not sort of focus myopically on these notations that come out of the ICA reviews because, of course, it's difficult. We're looking at a cold record as an appellate court here. But it's important to remember that each of those notations follows a live hearing that was held every 90 days at which Mr. Smith was given notice. He was given an opportunity to be heard. He was given the opportunity to have a counselor with him to advise him if he needed to appeal that, in addition to all of the other elements of review, which were provided. And I disagree with my friend that this court either can't consider them or should ignore the fact that the VDOC policies do call for review by the external team, by other teams. Yes, Your Honor. How many? Wasn't there a point at which Gilbert, Officer Gilbert conducted the review and also served as his own second reviewer approving his review about this needs longer period of stable adjustment? Didn't that occur? There were times when arguably the policy was violated, but a policy violation does not equate to a violation of due process. Again, the question for due process, even leaving aside qualified immunity. How many times does the policy need to be violated before it equates to a lack of due process? Well, Your Honor, I think it would depend on whether the policy is even required for due process purposes. And I would submit what you have here, even leaving aside the reviewing component of it, you have a review every 90 days that the defendant is provided with the hallmarks of due process protections that the Supreme Court has recognized, which is notice and an opportunity to be heard. And again, we're talking about one component of what the step down program allows, which is ICA reviews. There is also reviews by the external team, which is sort of high level officials from the, within the region that the prison is located. The chief re-entry officer, the regional administrator, the chief medical. Doesn't, shouldn't it somewhere in the procedures and the notice and all of that provide him some explanation of what it is he needs to do, what to get out of this longer period of stable adjustment, even if perhaps it is as Judge Gregory hypothesized, because he stabbed or assaulted the guard. And so we're just going to leave you in here for a year or two years. I don't think that's correct. I think what the step down program is intended to do is to provide an incentive based system where inmates who do commit very serious offenses, like Mr. Smith are nonetheless expected to go through a program and return to the general population. And to your question, your honor the program itself provides that information. Mr. Smith would have been told what he would have understood what the steps were. It's undisputed in this record. The district court says, and this is a day to 98 that Mr. Smith's counselors talked with him repeatedly and frequently about the step down process. So again, I would, I would urge this court not to focus myopically on these sort of one or two sentence things. And these notations that follow the reviews, because it doesn't take into account the fact that they were following actual live hearings. And again, your honor, I would also disagree with my friend that we should ignore. Judge Floyd has a question. I think, Oh, I'm sorry, your honor. Does the length of the segregation have anything to do with this case? Your honor. I think the length of the segregation weighs in VDOC's favor in this case. Uh, what the court in Wilkinson referred to, uh, the sort of duration factor, the court in Wilkinson was talking about and referred to an indefinite duration. And I think that that applies in two ways in this case. First, of course, the fact that Mr. Smith has been released from segregation sort of shows that his confinement was not indefinite. But I think there's a second issue here, which is that in Wilkinson, but the Supreme court said was the only limitation on someone getting out of supermax is the end of their sentence. And here, that is not the purpose of the step down program. And it is not how the step down program works. The step down program is not intended to be indefinite segregation. It is intended to be a process, which this court itself just a few months ago in Greenhill referred to as sophisticated and well-conceived because it is incentive based. It is designed to, again, get these offenders back to, uh, back to the general population. And again, I think for purposes of the qualified immunity analysis, that is a highly relevant factor because we're looking to what a reasonable officer in the defendant circumstances would have known at the time. And what an officer in their circumstances would have known is that based on the policies, based on the features of the step down program, every judge to have looked at it said that it was, that it did not create a Liberty interest because there was no atypical hardship. So to suggest that, uh, that the VDOC officials should have known something different than federal judges, I think, again, is inconsistent with any version of qualified immunity that I'm familiar with. And when you couple that with the fact that this court has already said in a published opinion that Wilkinson, because of the way it's a flexible test, because of the way it works, unless you have exactly the same features as the Ohio Supermax prison, which you certainly do not have here, Wilkinson is not sufficient to overcome qualified immunity. And again, that's the only case that my friend cites. And again, because Mr. Smith concedes that his, uh, his claims to injunctive relief are moot and concedes that the only issue left is the individual capacity claim for damages. I would urge this court to, to find qualified immunity here, because again, the record is, is clear. And just to briefly address the discovery point. Um, I think it's clear Mr. Smith has waived his, his claim. Uh, the, the fact that he's pro se doesn't matter. I would, I would urge this court to look at the second circuit circuit's decision in Cater versus Onondaga County, which specifically looks to the difference between a dispositive and a nondispositive motion with respect to a pro se inmate and fines waiver, even in the context of a nondisposable dispositive motion. Yes, sir. Mrs. Zucconi in answering judge Thacker's question about when he returned to red onion, he got out of the segregation program. The only reason you profits for that was that the rule changed as to religious observance in terms of their hair for religious purpose. Is that right? Yeah. Correct. I'm sorry, your honor. I think I might've lost you. That's the only reason that you said the change was because he got out because of the religious, they allowed people to have their hair, uh, different left based on religious beliefs. Correct. Your honor on, on J 71, that is, uh, that is something that's included in the discovery record. And I think, uh, based on the timing, it seems like an appropriate assumption that, uh, the thing that was holding him back when that policy was changed, he quickly advanced that it's, it's a reasonable assumption that the reason he advanced was because of the change in policy. Yes. So that means that before he left Wallenberg, he had already reached that, uh, stable adjustment period. Well, no, your honor. I mean, it depends on how you understand stable adjustment. And if the policy is that one must comply with the grooming policy in order to not have a poor rating on your personal hygiene scores, which is one component of the personal responsibility, um, aspect of step down, which is one component of the larger program, which also includes not having disciplinary infractions and the light. Um, I, I think that it's perfectly reasonable for an official who understands the policy. You mentioned disciplinary infraction. One, one of them that he was, he was, uh, cited for ordering a non kosher meal when they didn't have a kosher meal available for him. Was he cited for that? Your honor. There are a few disciplinary infractions in the record. Uh, I don't understand, uh, the record to suggest that those were the reasons that he was kept back. That's, that's not what the F that that's not the explanations provided. Um, I'll take your honor's word that that's the reason for the disciplinary infraction. Um, but again, that's not the reason provided the reasons provided were that he needed a longer period of stable adjustment with respect to the grooming policy. I think that, uh, as your honor suggested, or I'm sorry, one of your colleagues suggested not following the, the rules with respect to personal grooming was considered to be a demerit at that time. And for that reason, the officials would have been, uh, sort of within policy to say that it was inconsistent with proceeding if he refused to follow the grooming policy. All right. If the court has no further questions, I thank you for your time. Thank you. Counsel. It's my call. You have some time reserved. Your honors. I'd like to make three points. First, this court can and should remand this case for the district court to address qualified immunity in the first instance, but should it address the question of qualified immunity? Mr. Smith's protected Liberty interest was clearly established at the time of the challenge conduct, not just by Wilkinson D Austin, but by this court's own decision in Kuma in which prison, which prison officials kept inmates in the same extreme restrictions and Mr. Smith endured. The inmates in Akuma were also kept in a cell for 23 to 24 hours a day, of course, eat all of their meals alone in that same cell and had limited access to visitation and recreation. And a reasonable prison official would have understood that keeping Mr. Smith in conditions of confinement that are virtually the same as the inmates in Akuma and in Wilkinson clearly established that, that for Smith had a protective Liberty interest in avoiding those kinds of confinement conditions indefinitely. Second, the step down program policies do not resolve whether Mr. Mr. Smith received meaningful review. Mr. Smith alleged he was not allowed to participate in step down prison programming. Defendants routinely violated policy in the ICA reviews and the revised step down behavioral goals that defendants site is the reason, the real reason why Mr. Smith was elevated from the harshest segregation restrictions to the initial stage of non-segregated confinement. Wasn't the reason that was cited as to why Mr. Smith was advanced. The reason that was cited, the reason that defendants gave Mr. Smith is that, or that prison official of red onion gave Mr. Smith was that he completed the challenge series, which was a curriculum program that he finished four years earlier, over four years. Third, longer period of stable adjustment is not an adequate rationale to constitute meaningful review. Defendant Gilbert in response to Mr. Smith meant without pointing to a specific review date, getting that kind of vague rationality, rote repetition, it's on three fashion does not constitute meaningful review as evidence. And Mr. Smith is pleased for further explanations. There are no further questions. We asked this court to reverse the district court's conclusion that Mr. Smith did not endure an atypical and significant hardship. And as a result, reverse the district court's grant summary judgment. Thank you. Counsel. Ms. Hashimoto, can you join the screen for us? Yes, your honor. Don't go away. Mr. McCullough. I think you can share the screen. So all counsel, I want to thank you so much. We'll have to spend our traditional coming down to shake your hand, but know that in a virtual sense, it is certainly done. And we appreciate your argument. And, uh, Sasha motor. I also note that you were court assigned. Thank you so much. On behalf of the fourth circuit, we could not do our job without counsel like you, uh, taking on those assignments and representing, uh, uh, litigants and, and also add the cherry on top. You have a loss to them with you, an opportunity to hear from, uh, from the academy and, uh, the Hoyas, uh, acquitted themselves well today. And this, uh, is well representing, uh, your side. Uh, we appreciate that. And I wish you all well, please be safe and stay well. Thank you counsel. Thank you. Your Honor. There's something you're trying to do.
judges: Roger L. Gregory, Henry F. Floyd, Stephanie D. Thacker